## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Covenant Weddings LLC** and **Kristi Stokes,** | Case No.  1:20-cv-01622 |
| Plaintiffs, | |
| v. | **Verified Complaint** |
| **Cuyahoga County,** | |
| Defendant. | |

## Introduction

Since she was young, Kristi Stokes has shared her faith and ministered to others. She has served as a missionary in Zimbabwe, helped the homeless in Cleveland, and preached to churches in Ohio. Now an ordained minister and wife, Kristi wants to minister through her business, Covenant Weddings, which officiates weddings and composes wedding homilies, vows, and prayers on a commission basis.

Like other ministers, Kristi chooses which weddings to officiate and write about based on her faith. While Kristi works with and tries to convey God's love to everyone no matter who they are, she can only celebrate weddings consistent with her beliefs. In this way, Kristi exercises the commonplace and long-standing freedom to speak messages and participate in sacred ceremonies of her choosing.

But this freedom has become a bit too old-fashioned for Cuyahoga County. The County recently passed a law that forbids businesses from discriminating on the basis of sexual orientation or gender identity. (Cuyahoga County Code Title 15). When applied to Kristi though, this law requires her to officiate and promote

weddings she disagrees with—weddings celebrating same-sex marriage and gender identities contrary to one's biological sex. Specifically, because Kristi offers wedding services that celebrate marriage between one biological man and one biological woman, the County says she must also provide the same services for weddings that contradict her beliefs or Kristi commits illegal "discrimination." Cuyahoga Cty. Code § 1501.02(C). This in turn means that Kristi must officiate same-sex weddings, pray over same-sex marriages, write vows calling biological men women, write homilies using incorrect or gender-neutral pronouns (like Per, Xe, and Ze) or face heavy fines, attorney fees, and injunctions.

But the problems don't stop there. The County law also makes it illegal for Kristi to explain on her company's website or social media sites that she can only provide wedding services consistent with her religious views on marriage and gender. The County considers these communications to be unlawful discrimination too, because they supposedly indicate that clients will be treated "differently" because of sexual orientation or gender identity. Cuyahoga Cty. Code § 1501.02(C)(1).

The County, however, cannot rescind religious liberty and free speech by re-labelling them discrimination. In reality, Kristi gladly works with people regardless of who they are, including LGBT individuals. She just cannot officiate or bless every marital union. Other ministers and speakers often make this choice. Imams should not be forced to officiate Christian weddings they object to or write vows they disagree with. Nor should LGBT artists be forced to sing at church services or draft church pamphlets condemning same-sex marriage. Likewise, Kristi should be free to officiate and celebrate the ceremonies she believes in. The First Amendment and

2

Ohio's Constitution guarantee her as much. And the County is wrong to approve these choices for others while ripping them away from Kristi.

In fact, Kristi has already risked prosecution by declining to officiate a same-sex wedding. And she continues to chill her speech and cripple her business just to avoid violating the law. Meanwhile, Kristi has watched as officials across the country have punished business owners like her—threatening them with fines and jail—for declining to promote same-sex weddings. So the County's law has left Kristi with an impossible choice: disobey the law, defy her faith, desecrate her ministry, or ditch her business.

None of these options are acceptable. To Kristi. To her faith. Or to the First Amendment. Left with no other options, Kristi filed this lawsuit to protect her constitutional freedoms and help protect freedoms vital to everyone in a tolerant and pluralistic society—the freedoms to participate in ceremonies we choose, to proclaim messages we admire, and to practice the beliefs we hold most dear.

## Jurisdiction and Venue

1.     This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.      This civil-rights action also raises state questions under Section 7, Article I of the Ohio Constitution.

3.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction under 28 U.S.C. § 1367.

4.     This court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested

damages under 28 U.S.C. § 1343 and 42 U.S.C. § 1983; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and 28 U.S.C. § 115 because all events giving rise to the claims occur within the Northern District of Ohio's Eastern Division and because Defendant resides there.

### Plaintiffs

6.      Kristi Stokes is a United States citizen and resides in Cuyahoga County, Ohio.

7.      Kristi is the sole member-owner of Covenant Weddings LLC.

8.      Covenant Weddings is a for-profit limited liability company organized under Ohio law.

9.      Covenant Weddings' principal place of business is located in Cuyahoga County, Ohio.[1]

### Defendant

10.     Cuyahoga County ("County") is a municipal corporation authorized under Ohio law with the power to sue and be sued, to appoint members to the County Commission on Human Rights ("Commission"), and to enact and enforce the ordinance challenged in this lawsuit. *See, e.g.*, O.R.C. §§ 301.22, 302.12, 302.18(A); Cuyahoga Cty. Charter art. I, § 1.01; art. II, § 2.03(1); art. III, § 3.09; Cuyahoga Cty. Code § 206.13(A)–(B).

### Factual Background

Kristi Stokes and her Christian faith.

11.     Kristi is an evangelical Christian and a minister licensed under Ohio law.

---

[1] The complaint refers to Plaintiffs as "Kristi" unless context indicates otherwise.

12. Kristi became a Christian when she was eight after watching her father become a Christian, transform his life, and become sober after years of alcoholism.

13. Kristi became and has remained active in her church.

14. Kristi's faith shapes every aspect of her life, including her identity, relationships, actions, and understanding of creation, truth, morality, and beauty.

15. Kristi believes that everything she does—personally and professionally— should be done in a manner that glorifies God and that God calls her to steward her God-given gifts in a way that glorifies and honors Him.

16. Ever since she was young, Kristi has been religiously motivated to spend her life serving and helping others.

17. For example, as a young adult, Kristi volunteered at her church and in a soup kitchen with her family.

18. After high school, Kristi served as a missionary in very poor areas of Zimbabwe and South Africa where she taught AIDS education classes at hospitals and schools, helped individuals to access food, medical care, and other resources, and shared her Christian faith with those she met along the way.

19. When Kristi returned to the United States, she married and went back to school where she earned her bachelor's degree in biblical studies and her master's degree in pastoral ministry.

20. Kristi is currently working on her Ph.D. in chaplaincy.

21. Kristi has also held numerous formal ministry positions, including working as an associate pastor at a church.

22. In this position, Kristi regularly wrote about matters of faith, met with the sick and elderly, and led education classes for church members.

5

23.    Kristi also occasionally delivered sermons and coordinated religious events, including baptisms, baby dedications, and conferences.

24.    Kristi also assisted the lead pastor by meeting with engaged couples, coordinating wedding planning, and helping draft content for weddings, such as vows.

25.    Throughout her ministry experiences, Kristi developed a talent and passion for writing and speaking and a love for meeting with and encouraging others in times of need and of joy.

26.    Then in 2018, Kristi came across another opportunity for formal ministry when she was asked by a family member to officiate her wedding.

27.    So Kristi became officially ordained as a minister and officiated that wedding in December 2018.

28.    Kristi also wrote a custom homily and custom vows and prayers for this wedding.

29.    Kristi enjoyed this officiating and writing because they allowed her to take a creative role in the beginning of a new marriage, support a couple she loved, and proclaim her religious beliefs about God's plan for marriage.

30.    Afterwards, Kristi felt inspired by God to begin a new phase of her ministry career by officiating and writing for weddings generally.

31.    Kristi realized that by officiating and writing homilies, vows, and prayers for weddings, she could satisfy her passion to serve others while promoting her religious beliefs about God's design for humanity.

32.    So Kristi decided to start a business devoted to celebrating weddings— Covenant Weddings.

<u>Kristi starts Covenant Weddings to celebrate marriages.</u>

33.     Kristi founded Covenant Weddings in August 2019.

34.     Through Covenant Weddings, Kristi personally officiates and writes custom homilies, vows, and prayers for weddings.

35.     Initially, Kristi operated her business as a sole proprietorship under the name "The Officiant."

36.     She promoted her business to the public on Facebook and Instagram and received requests for services through personal contacts and social media.

37.     As the business grew, Kristi decided to rebrand and restructure to gain the benefits of a limited liability form.

38.     In May 2020, she organized her business as a limited liability company and renamed it Covenant Weddings LLC.

39.     Kristi chose that name to communicate her belief that marriage is a covenant made before God.

40.     Kristi believes that a covenant is a special kind of formal commitment that is solemn, binding, personal, relational, and created by taking an oath.

41.     Kristi is the sole owner and member and the only person employed by Covenant Weddings.

42.     Kristi also adopted a written declaration for her business in May 2020.

43.     Covenant Weddings abides by this written declaration.

44.     This written declaration specifies that Covenant Weddings' purpose is to allow Kristi to "pursu[e] her spiritual calling to share her faith, celebrate marriage, and glorify God."

45. Kristi updated her business' Facebook
(https://www.facebook.com/covenantweddingofficiant) and Instagram
(https://www.instagram.com/covenantweddingsllc/) accounts to reflect its new name.

46. Kristi also reserved a domain name to be used for her business website
(www.covenantweddings.org).

47. Kristi has designed content for this business website but has not yet made
this website publicly available.

48. She currently uses her social media accounts and personal contacts to make
her services available to the public.

49. She also uses her social media accounts to congratulate the couples she works
with and to promote and celebrate the beauty of marriage to her clients, their
friends and family, and to the general public.

50. Kristi intends to use her business website in materially similar ways once
she publishes that site.

Kristi offers officiating and composition services to the public.

51. Covenant Weddings is a for-profit business that offers wedding services to the
public on a commission basis.

52. Covenant Weddings offers two types of wedding services: (1) Kristi officiates
weddings ("officiating services") and (2) Kristi composes original, tailored, and
customized wedding homilies, vows, and prayers ("composition services").

53. These services allow Kristi to combine her talent and passion for writing and
public speaking with her love of marriage and ministry while also earning a living.

54. Kristi offers her services in three basic packages.

55. First, Kristi officiates weddings and writes original, custom content—
including homilies, vows, or prayers—for weddings she officiates.

56. Second, Kristi officiates weddings in which she does not write any of the homilies, vows, or prayers.

57. Third, Kristi writes original, custom content—homilies, vows, or prayers—for weddings she does not officiate.

58. But in all cases, Kristi always either officiates the wedding ceremony or writes a custom homily, vow, or prayer for the wedding ceremony.

59. As part of each of her packages, Kristi also offers to post about each client's wedding on Covenant Weddings' social media sites or website (once published).

60. Kristi also exercises her own editorial discretion about whether to post about each wedding.

61. Kristi's wedding posts always contain celebratory text congratulating the couple and celebrating their marriage and also promoting Kristi's belief that marriage is a sacred union between one man and one woman.

62. Kristi's wedding posts may also contain biblical references discussing marriage and an excerpt from the homily, vows, or prayers that Kristi creates if she creates such a piece for her clients.

63. Kristi's name, Kristi's picture, Covenant Weddings' name, or Covenant Weddings' logo always appears in or nearby these wedding posts.

64. Kristi publishes these wedding posts to publicly celebrate, encourage, and congratulate each couple, to publicly associate herself with her wedding services, to promote her business, to proclaim her religious beliefs about marriage, to allow each client to identify with Covenant Weddings, and to allow each couple to publicize their wedding and reach a greater audience than they otherwise could.

65. Every wedding service that Kristi offers is created custom for each client.

66. Other businesses offer similar wedding services.

67.     For example, the Wedding Wire lists over 150 wedding officiants in Ohio and almost 5,000 wedding officiants throughout the United States.

https://www.weddingwire.com/c/oh-ohio/wedding-officiants/9-sca.html;

https://www.weddingwire.com/wedding-officiants.

68.     Likewise, custom wedding writing services are becoming increasingly popular. *See* Jenn Sinrich, *The Scoop on Hiring a Professional Wedding Vow Writer*, Wedding Wire (Jan. 6, 2020), https://www.weddingwire.com/wedding-ideas/wedding-vow-writer; Jamie Birdwell-Branson, *Should you Hire a Professional Vow Writer*, Brides (Feb. 2, 2019), https://www.brides.com/story/should-you-hire-a-professional-vow-writer.

<u>Kristi's faith inspires her to officiate and write about weddings.</u>

69.     Kristi's faith inspires everything she does through Covenant Weddings, including how she interacts with prospective and existing clients and how she officiates, writes, and speaks about weddings.

70.     Kristi believes that God designed marriage as a gift for people of all faiths, races, and backgrounds and that God ordained marriage to be a covenant between one man and one woman that reflects and points people to the special covenantal relationship Jesus shares with His Church.

71.     Kristi believes that God created marriage to be a sex-differentiated union, meaning marriage can only be between one biological man and one biological woman.

72.     Kristi believes that marriage should not be redefined to include any other relationships—such as relationships between more than two people or between two people of the same biological sex.

73.     Kristi believes that all wedding ceremonies are inherently religious events because they solemnize and initiate an institution (marriage) created by God.

74.     Kristi also adheres to biblical teaching about the human person, human identity, and gender, including that God created every person in His image to be male or female.

75.     Kristi believes that a person's sex is based on their biology, including their chromosomes, is fixed from the moment of conception, and cannot be chosen or changed.

76.     Kristi also believes people should act and identify consistent with their God-given biological sex.

77.     Kristi holds a Christian view of creativity.

78.     Kristi believes that human beings reflect God's image when they speak and create aesthetically pleasing artistic works. (Psalm 33:3).[2]

79.     Kristi also believes that human beings participate in a relationship with, talk to, and honor God when they pray. (1 Thessalonians 5:16–18).

80.     Kristi believes that God has blessed her with a talent and passion for creative writing and that she reflects God's artistry by creating artistic works, including homilies, vows, or prayers for wedding ceremonies.

81.     Kristi believes that her role in officiating weddings also reflects God's creative work because, in every wedding ceremony, she uses celebratory language to help initiate and pronounce that a new marriage has begun.

82.     Kristi believes that she has a religious calling to use her God-given talents to honor Him.

---

[2] All Bible citations reference the English Standard Version.

83.    Kristi promotes her religious beliefs and pursues her religious calling through her wedding services by participating in and celebrating the beauty, commitment, intimacy, and love embodied in weddings and in marriages between one biological man and one biological woman.

84.    Kristi believes that by doing so, she can promote God's love, God's design for marriage, the beauty of marriage, her religious beliefs about marriage and gender, and the biological differences between men and women to her clients, the wedding audience, and the public.

85.    Kristi believes that redefining marriage as anything other than the union between one man and one woman conflicts with God's design for marriage.

86.    Kristi believes that redefining sex to include any status other than the status of being biologically male or female conflicts with God's design for human identity.

87.    Kristi believes that her God-given creative talents equip her to convey messages to the public in a compelling way about God's design for marriage and biological sex.

88.    Kristi's desire to promote God's design for marriage and gender has increased as she has observed the growing cultural acceptance of certain views about marriage and biological sex that contradict her religious views.

89.    Kristi hopes that by participating in and celebrating marriages between a man and a woman and by promoting biological sex consistent with her religious beliefs through Covenant Weddings, she can help counter this cultural narrative.

Kristi exercises editorial control over her wedding services.

90.    Kristi solicits and receives requests for her wedding services through her business social media sites and personal contacts.

91.     Once published, Kristi will also be able to receive requests for her wedding services through her business' website.

92.     Kristi can receive requests for and provide composition services for clients located anywhere in the country.

93.     Kristi typically receives requests at least several months before the wedding is scheduled with some requests coming more than a year before the wedding.

94.     When Kristi receives a wedding-services request from the public, she evaluates it and decides whether she can potentially provide these services.

95.     Kristi also tries to build genuine relationships with her clients and share God's love with them.

96.     Kristi does this by scheduling a meeting with the bride or groom individually or together as a couple so that she can get to know them and discuss their wedding ceremony.

97.     Kristi typically holds these meetings face-to-face, but she would do so by video or phone if necessary.

98.     During this meeting, Kristi talks with the couple about her views on marriage and asks about their relationship, upcoming wedding ceremony, and requested wedding services to learn more about them as a couple.

99.     If Kristi determines that the requested wedding services would not violate, contradict, or be inconsistent with her religious beliefs, she will execute a written service agreement with the client.

100.    This agreement specifies the terms and processes by which Kristi provides her wedding services.

101.    According to this agreement, Kristi "retains complete artistic and editorial freedom with respect to every aspect of all wedding services" she provides.

102. This agreement also requires Kristi's clients to attribute Kristi's homilies, vows, and prayers to Kristi when clients publicly display these pieces.

103. If possible, Kristi continues to meet with couples as they prepare for their wedding.

104. During these meetings, Kristi tries to encourage each couple, prepare them for marriage, and educate them about God's design for marriage.

105. Kristi uses information from these pre-wedding meetings to customize her wedding services so that everything she provides (including content in her wedding services) is tailored to and about each couple.

106. For all of Kristi's wedding services, Kristi's clients rely on her professional and artistic judgment and her vision for how to celebrate their wedding and marriage.

107. Kristi typically makes most decisions about her wedding services without receiving any suggestions from her clients, including how to describe their marriage, how to encourage the couple, how to praise God through prayer, and how to describe the weddings when Kristi posts about them on her social media sites.

108. For all other decisions Kristi makes about her wedding services, Kristi receives suggestions from and collaborates with clients about these suggestions.

109. Whenever Kristi's clients offer suggestions about Kristi's wedding services, they typically defer to Kristi's advice and suggestions.

110. For example, Kristi's clients might have a general idea about the overall tone of their wedding ceremony or a specific Bible verse that is meaningful to them.

111. Kristi considers these suggestions, provides her own guidance, and often incorporates the clients' suggestions into her wedding services so that the ceremony

celebrates the couple's marriage and promotes Kristi's religious beliefs about marriage.

112.   But even when Kristi's clients make suggestions, they still depend on her judgment about how to officiate and write about the ceremony and how to celebrate marriage in general and their wedding in particular.

113.   Over every aspect of her wedding services, Kristi exercises ultimate editorial control and retains the right to reject any client suggestion that violates Kristi's artistic judgment or religious beliefs.

114.   Each component of Kristi's wedding services—officiating the ceremony and creating homilies, vows, or prayers—separately and in combination, are expressive because they involve text, spoken word, personal performance, or other modes of expression.

115.   Each component of Kristi's wedding services—officiating the ceremony and creating homilies, vows, or prayers—separately, and in combination, are also religiously motivated because they are all designed to celebrate a religious ceremony and to convey messages bolstering Kristi's religious beliefs about marriage and gender.

<u>Kristi participates in and celebrates weddings through her officiating services.</u>

116.   When Kristi officiates a wedding, she also offers to (1) walk through the ceremony with the couple and their families at the rehearsal; (2) to attend, pray at, and participate in the rehearsal and reception; and (3) assist the couple in planning and preparing the ceremony.

117.   When Kristi is hired to walk through the ceremony at the rehearsal, Kristi attends and participates in the rehearsal.

118.   For example, during the rehearsal, Kristi instructs the couple, the wedding party, and the couple's family where to stand and sit during the ceremony; she reviews the schedule of events during the ceremony; and she answers questions asked by the couple, their families, or the wedding party.

119.   When Kristi is hired to pray at the rehearsal or reception, Kristi often prepares the prayer's text in advance.

120.   Kristi's prayers during the rehearsal or reception typically ask God to bless the marriage, keep the couple safe, and maintain the bride and groom's commitment to each other.

121.   Kristi's prayers during the rehearsal or reception always celebrate the couple's marriage.

122.   When Kristi is hired to help plan and prepare the ceremony, she collaborates with the couple to create an order of events and to decide on other details about the ceremony.

123.    On the wedding day, Kristi celebrates the couple's marriage with the marrying couple, their family, and their guests.

124.   Kristi also associates with the couple and their marriage throughout the wedding day.

125.    For example, as guests arrive, Kristi interacts with them, verbally encourages them to rejoice together about the new marriage being formed, praises the upcoming marriage, and shares in their joy over the couple's upcoming wedding.

126.   Throughout the day, Kristi also interacts with the marrying couple and verbally encourages them to enjoy the special day and to rejoice in the gift of their new marriage.

127.   Kristi also communicates excitement and joy for the couple and for their marriage through her presence, tone of voice, facial expressions, conduct, and demeanor at the ceremony.

128.   Kristi could not effectively provide her wedding services if she did not personally interact with, communicate to, and verbally encourage the couple and the wedding guests in these ways.

129.   Each wedding ceremony that Kristi has officiated has been attended by more than one hundred people.

130.   Once the ceremony begins, Kristi stands in front of the audience to await the bride and groom.

131.   She does this to be visible and audible to the marrying couple, their family, and their guests.

132.   After the groom and/or bride walk down the aisle, they stand in front of the audience too, next to Kristi.

133.   Kristi typically begins the ceremony by welcoming the audience to the wedding ceremony on behalf of the marrying couple.

134.   Kristi does this to communicate that she, the couple, and the attendees are present with the common purpose of celebrating the marriage.

135.   If Kristi has been hired to deliver a homily during the wedding ceremony, she then orally delivers a homily.

136.   After the homily, Kristi orally administers the vows.

137.   When Kristi provides a couple with both officiating and composition services, her homily, vows, and prayers convey the same messages that she conveys through her composition services. *See infra* ¶¶ 161–70.

138. When Kristi is hired only to officiate the wedding, Kristi requires that any homily, vows, or prayers she delivers convey a celebratory message about marriage, acknowledge God's authority over marriage, describe marriage as a relationship which is intended to be a lifelong commitment between one man and one woman, and use gender-differentiated language like the couple's names or gender-differentiated pronouns that reflect the bride and groom's biological sex.

139. Kristi does not provide officiating services for any client whose homilies, vows, or prayers require Kristi to criticize or devalue marriage, do not mention God's authority over marriage, describe marriage as anything other than a relationship which is intended to be a lifelong commitment between one man and one woman, or use gender-neutral language that does not reflect the bride and groom's biological sex (such as gender neutral pronouns or pronouns that do not reflect someone's biological sex).

140. Likewise, for every wedding she officiates, she administers the vows to maximize the seriousness of the couple's commitment to each other and to emphasize the beauty of their personal promises.

141. After the vows, Kristi always pronounces each couple as "husband and wife" by virtue of her authority vested in her by God and by the state.

142. Kristi always presents each newlywed couple for congratulations to the guests as "Mr. & Mrs."

143. Kristi also expresses her own personal joy and approval of the marriage at each wedding ceremony by announcing that she presents the newlywed couple as husband and wife "with great honor and joy" (or something materially similar).

144.    In these ways, Kristi acts as a witness and participant before God, the couple, and their guests as the bride and groom commit their lives to each other through exchanging vows and rings.

145.    Kristi attends, celebrates, solemnizes, and personally participates in every wedding she officiates.

146.    Kristi's responsibilities during her officiating services—including coordinating the wedding ceremony, delivering the homily, administering the vows, and announcing the married couple—require Kristi to physically attend and actively participate in each wedding ceremony.

147.    Kristi cannot practically leave the ceremony at any time or arrive late or avoid physically participating in the ceremony.

148.    Kristi's physical attendance and participation in the wedding ceremony always include her presence at the front of the venue next to the bride and groom, invitation to the guests to join her in celebrating the couple's marriage, administration of the couple's vows, proclamation that the couple's marriage has taken place by virtue of the authority vested in her by God and by the state, presentation of the newlywed couple to the audience for their congratulation, and use of some gender-differentiated language to describe the bride and groom.

149.    After Kristi officiates a wedding, she always signs the couple's marriage license.

150.    As a licensed minister, Kristi is one of a few categories of people authorized to solemnize a wedding under Ohio law. O.R.C. § 3101.08.

151.    Every marriage certificate that Kristi has signed in Ohio has required her to write in the date, month, and year of the ceremony, state that she "solemnized the Marriage" of the couple, sign her name, and indicate the location of the ceremony.

152.    If Kristi is hired for the wedding reception, she expresses her personal excitement and joy for the couple by attending the reception, praying for the couple, blessing the food, and rejoicing and interacting with the couple and their guests.

153.    Within a few days after officiating a wedding ceremony, Kristi also publishes a post about the wedding on Covenant Weddings' social media sites or will publish such a post on Covenant Weddings' website (once published) if doing so is consistent with Kristi's editorial judgment. *See supra* ¶¶ 59–64.

154.    After the wedding day, Kristi attempts to stay connected to the couple.

155.    Kristi has maintained contact with every couple she has served to date.

156.    Kristi hopes that by doing this she can encourage couples in their marriage and share the same life-changing love of God that led her to faith in Christ.

157.    Within 30 days of solemnizing the marriage, Ohio law requires Kristi to transmit a marriage certificate to the probate judge in the County or be punished by a fine. O.R.C. §§ 3101.13–14.

158.    Kristi has submitted a certificate of marriage to the County for every wedding she has officiated in Ohio since starting her business.

Kristi writes about and celebrates weddings through her composition services.

159.    In addition to officiating weddings, Kristi provides composition services: she writes custom homilies, vows, and prayers for weddings.

160.    Kristi offers her composition services all together (a homily, vows, and prayers), separately (a homily, vows, or prayers), or in some combination.

161.    All of Kristi's composition services always celebrate marriage in general and the marrying couple in particular.

162.    All of her composition services are custom and fully tailored to the couple and marriage she is writing about.

163. Kristi's composition services always highlight the couple's love for each other and their commitment to marriage, celebrate God's gift of marriage between one man and one woman, illustrate how marriage between a man and a woman reflects God's love for His creation, reference the lifelong commitment of marriage, use gender-differentiated language to describe the bride and groom, and recognize God's authority over marriage.

164. For example, when Kristi writes a prayer, that prayer celebrates the marriage and asks God to bless the marriage, to keep the couple safe, and to remind the couple of their commitment to each other.

165. Kristi always quotes Scripture in the custom homilies she writes.

166. She also always uses Scripture as the basis and inspiration for the custom vows and prayers she writes.

167. In her homilies, vows, and prayers, Kristi typically states her belief in the permanence of marriage, her belief in the monogamous nature of marriage, that marriage is a covenantal union between one man and one woman, and that marriage is a gift from God.

168. In her homilies and vows, Kristi always states her belief that marriage is a relationship between one biological man and one biological woman by, for example, referring to the couple according to their biological sex through gender differentiated pronouns and other language like bride and groom.

169. In her prayers, Kristi always states her belief that marriage is a relationship between one biological man and one biological woman by, for example, using gender-differentiated language such as the couple's names or gender-differentiated pronouns.

170.    For example, Kristi's homilies and vows include statements like "nothing will separate the beautiful union of your two souls joining together as one today," "before the eyes of loved ones and God," "holy matrimony," marriage is "the very reflection of the love of God," "who gives this woman to this man," "husband," "wife," "him," "her," "bride," "groom," take this woman "to be your wife," and take this man "to be your husband."

171.    Kristi does not provide composition services that criticize or devalue marriage, do not mention God's authority over marriage, recognize marriage as any other relationship than an intended lifelong commitment between one man and one woman, or require her to use gender-neutral language that does not accurately reflect the bride and groom's biological sex (such as gender neutral pronouns or pronouns that inaccurately reflect someone's biological sex).

172.    Kristi spends between 4-8 hours preparing a homily, vows, and prayers for each client.

173.    Kristi professionally prints a copy of the homily, vows, or prayers she creates for each couple and asks that they read it together every year on their anniversary and recommit to their vows.

174.    Kristi requests this because of her belief that marriage is a lifelong covenant and her hope that each couple fulfills that commitment.

175.    Within a few days after a wedding ceremony for which she provides composition services for a wedding, Kristi also publishes a post about that wedding on Covenant Weddings' social media sites or will publish such a post on Covenant Weddings' website (once published) if doing so is consistent with Kristi's editorial judgment. *See supra* ¶¶ 59–64.

<u>Kristi only officiates and writes content for certain weddings.</u>

176.   Not only do Kristi's religious and creative beliefs inspire what she officiates and writes about, they also dictate what she cannot officiate or write about.

177.   Kristi believes that she cannot rejoice in, condone, participate in, celebrate, or promote anything dishonorable to God.

178.   Kristi believes that to stay true to her faith and her religious calling to be a minister she can only participate in wedding ceremonies and only celebrate weddings consistent with her understanding of the Bible's teaching about marriage, sex, gender, and creativity.

179.   For Kristi, this means she cannot participate in or create anything for weddings which would require her to denigrate the couple or their wedding, marriage, or relationship, or that would undermine Kristi's religious views on marriage.

180.   For this reason, Kristi only accepts requests for wedding services which are consistent with her religious beliefs and creative judgment.

181.   Likewise, it is Kristi's policy and practice to only offer wedding services celebrating weddings between one biological man and one biological woman and to decline any requests celebrating other weddings which would violate Kristi's religious and artistic beliefs or require her to participate in any ceremony that contradicts her religious beliefs.

182.   Ministers of many faith traditions commonly exercise this discretion when choosing which weddings to officiate.

183.   This discretion is a mandatory practice for ministers of Kristi's evangelical Christian tradition as well. (*See* 1 Timothy 3:9–11).

184.    Commissioned writers also frequently decline to create content that violates or compromises their beliefs or editorial judgment.

185.    Kristi will officiate weddings and write custom homilies, vows, or prayers for weddings so long as the ceremony she officiates or the content she creates (1) does not violate or is not inconsistent with her religious beliefs or (2) does not detract from her goal as a minister of publicly honoring and glorifying God through her work.

186.    Accordingly, Kristi cannot officiate or write for wedding ceremonies that contradict biblical principles, trivialize the marital union, or force her to speak or write messages that violate her religious beliefs about marriage, sex, or gender.

187.    For example, Kristi could not provide officiating or composition services for marijuana-themed weddings, weddings that do not reference God's authority over marriage, wedding ceremonies between more than two people, or wedding ceremonies that celebrate open relationships like an open marriage.

188.    Because of her religious beliefs, Kristi also cannot provide officiating or composition services for a wedding between individuals of the same biological sex or where one or both of the marrying individuals identify and present as a gender other than their biological sex.

189.    Kristi will gladly work with people regardless of classifications such as race, creed, sexual orientation, and gender identity.

190.    Kristi does not object to and will gladly work with paying clients who are gay, lesbian, bisexual, or who are struggling with gender dysphoria so long as the ceremony or custom wedding content they request does not violate or contradict her religious beliefs.

191. Her objection to officiating certain ceremonies is an objection to promoting and participating in a sacred event that violates, contradicts, or is inconsistent with her religious beliefs.

192. Her objection to providing writing services for certain ceremonies is an objection to celebrating and promoting messages about marriage that violates, contradicts, or is inconsistent with her religious beliefs.

193. Kristi's objections to providing certain officiating and composition services are never about the person requesting or paying for her services.

194. For example, Kristi would officiate or write for a wedding ceremony where she is hired by the bride's gay father or by the groom's mother who identifies as male.

195. Kristi would also officiate or write for a wedding where a bisexual female bride marries a male groom so long as the couple intends the marriage to be a lifelong union between one man and one woman.

196. Likewise, Kristi would officiate or write for a wedding where a homosexual male groom marries a female bride so long as the couple intends the marriage to be a lifelong union between one man and one woman.

197. Kristi would also officiate or write for a wedding where the bride or groom struggle with gender dysphoria so long as they are committed to identifying and presenting in accord with their biological sex.

198. When evaluating whether any request for her wedding services is consistent with her religious beliefs and goals as a minister, Kristi considers, and it is her policy and practice to consider, the message conveyed by the requested services and whether these services require her to participate in or create content for a ceremony she objects to, not the identity of who requests or pays for those services.

25

199.   To fulfill the biblical command to love her neighbor, Kristi seeks to be honest with current and prospective clients and to treat them with love, honesty, fairness, transparency, and excellence.

200.   To do this, Kristi wants to ask prospective clients whether they seek her services to celebrate same-sex weddings or weddings where one or both of the marrying individuals identify and present as a gender other than their biological sex.

201.   Kristi also wants to explain the types of officiating and composition services she can and cannot provide.

Cuyahoga County's law threatens Kristi's ministry and livelihood.

202.   Kristi desires to operate her business consistent with her religious beliefs.

203.   But Kristi faces a likelihood and substantial risk that she will receive requests for wedding services that would require her to provide wedding services that would violate or be inconsistent with her religious beliefs.

204.   In fact, Kristi has already received such a request.

205.   Beginning in September of 2019, a potential client began communicating with Kristi about providing wedding services.

206.   Through social media and personal contacts, Kristi researched the type of wedding services requested and learned that the request sought to celebrate a wedding between two biological females, one of whom identified and presented as a member of the male sex.

207.   In December 2019, Kristi eventually declined to provide the requested officiating services because of a scheduling conflict but referred the requestor to another reverend who could officiate the ceremony.

208.    This request caused Kristi to evaluate the types of wedding services she would offer and how she would decline requests requiring her to promote or participate in events that violate her religious beliefs.

209.    This request also caused Kristi to research if she faced any legal penalties for providing wedding services only for weddings consistent with her faith.

210.    During Kristi's research, she read news reports about artists like photographers and calligraphers who faced lawsuits and severe penalties, were branded illegal discriminators, and suffered loss of business reputation for declining to celebrate same-sex wedding ceremonies.

211.    Kristi also learned about Cuyahoga County Ordinance Number 02018-0009 ("the County's law" or "the law").

212.    After reviewing the law, Kristi realized that she violates the law and faces significant penalties if she operates Covenant Weddings consistent with her religious beliefs about marriage and biological sex.

213.    The law prohibits discrimination in employment, housing, and places of public accommodation "based on race, color, religion, military status, national origin, disability, age, ancestry, familial status, sex, sexual orientation, gender identity or expression." Cuyahoga Cty. Code § 1501.01(K).

214.    The law defines "discrimination" as "the segregation, separation, maltreatment, ill-treatment, or any unfavorable difference in treatment" on the basis of certain protected characteristics. *Id.*

215.    The law defines a "place of public accommodation" as any "place for the sale of merchandise to the public, or any other place of public accommodation or amusement where the accommodation advantages, facilities, or privileges thereof are available to the public." Cuyahoga Cty. Code § 1501.01(W).

216.    Covenant Weddings is an establishment that provides services to the public on a commission basis and whose advantages and privileges are available to the public.

217.    Covenant Weddings also solicits and accepts the patronage of the general public through its social media sites and through personal contacts.

218.    Therefore, Covenant Weddings is a place of public accommodation under and subject to the County's law.

219.    The County's law § 1501.02(C) (the "Accommodations Clause") provides in part: "It shall be an unlawful discriminatory practice … [f]or any proprietor … or manager of a place of public accommodation to deny, discriminate against, or treat differently any person except for reasons applicable alike to all persons regardless of … sexual orientation, or gender identity or expression the full enjoyment of the accommodations, advantages, facilities, or privileges of a place of public accommodation."

220.    The Accommodations Clause makes it unlawful for Kristi to exclusively offer any of her wedding services for ceremonies between one biological man and one biological woman.

221.    The Accommodations Clause makes it unlawful for Kristi to exclusively offer any of her wedding services for ceremonies between individuals who identify consistent with their biological sex.

222.    The Accommodations Clause makes it unlawful for Kristi to decline a request for any of her wedding services for a wedding ceremony between two people of the same biological sex.

223.   The Accommodations Clause makes it unlawful for Kristi to decline a request for any of her wedding services for a ceremony where one or both of the individuals getting married identify and present as a gender other than their biological sex.

224.   The Accommodations Provision makes it unlawful for Kristi to maintain a written editorial policy or unwritten editorial practice of offering or providing wedding services only for marriages between one biological man and one biological woman.

225.   The Accommodations Clause makes it unlawful for Kristi to provide "any unfavorable difference in treatment" for a same-sex wedding ceremony or for a wedding ceremony where a marrying individual identifies as a gender other than their biological sex when compared to the treatment that Kristi provides for a wedding ceremony between one biological male and one biological female.

226.   The Accommodations Clause makes it unlawful for Kristi to provide less than the "full enjoyment" of services for a same-sex wedding ceremony or for a wedding ceremony where a marrying individual identifies as a gender other than their biological sex when compared to the services Kristi provides for a wedding ceremony between one biological male and one biological female.

227.   For example, the Accommodations Clause makes it unlawful for Kristi to treat wedding-service requests for same-sex wedding ceremonies different from wedding-service requests for opposite-sex wedding ceremonies—whether by responding to the former more slowly or by offering any part of her services to the latter but not the former.

228.   For example, the Accommodations Clause makes it unlawful for Kristi to respond to any wedding-service request by asking whether that request seeks

wedding services for a same-sex wedding ceremony or for a ceremony where a marrying individual identifies as a gender other than their biological sex.

229.   The Accommodations Clause forces Kristi to provide her wedding services for same-sex wedding ceremonies or for wedding ceremonies where a marrying individual identifies as the opposite sex and would require Kristi to proclaim messages and to participate in religious ceremonies that violate her religious beliefs, which she cannot do. *See supra* ¶¶ 220–28.

230.   This undercuts Kristi's message (expressed elsewhere in her social media accounts and wedding services) celebrating marriage between one man and one woman; harms Kristi's reputation among her past and prospective clients; undermines her editorial control over what services she offers to the public; and adversely affects Kristi's ability to share biblical truths about marriage with others.

231.   The Accommodations Clause also hinders Kristi's ability to explain on her website, on her social media sites, and directly to prospective clients that she cannot provide wedding services celebrating same-sex weddings or services promoting behavior or identification that contradicts one's biological sex.

232.   Although the County's law restricts Kristi's desired activities, it does not apply to public accommodations that "effectuate remedial or corrective action taken in response to past discriminatory practices against a historically marginalized group" and does not consider this action an "unlawful discriminatory practice." Cuyahoga Cty. Code § 1501.02(E)(2).

233.   Under this exemption, another public accommodation could decline to provide wedding services to any group of people who have not been "historically marginalized" and could prioritize wedding-service requests from "historically

marginalized" groups even though the Accommodations Clause does not allow Kristi to decline a request for wedding services contrary to her religious beliefs.

234.   This distinction turns entirely on the viewpoint that a wedding services provider holds and the content that he or she chooses to express.

235.   The County's law also prohibits certain practices regarding sexual orientation and gender identity in the areas of housing and employment, but exempts some activities done by religious institutions or organizations if done on the basis of sexual orientation. Cuyahoga Cty. Code § 1501.02(B)(2).

The County's law imposes significant barriers on Kristi's wedding services.

236.   The Accommodations Clause puts great pressure on Kristi and how she operates Covenant Weddings.

237.   For example, the Accommodations Clause limits Kristi's ability to expand her business and more actively advertise her wedding services.

238.   Kristi would like to expand her business and her online presence and to advertise more to promote her business and her message about marriage to more clients and more individuals.

239.   For example, Kristi has created a business website for Covenant Weddings and would like to launch this website. *See supra* ¶¶ 46–50.

240.   On this website, Kristi would promote her business, services, and message in favor of marriage between one man and one woman to the general public.

241.   Likewise, Kristi would like to attend and advertise in local bridal shows and magazines.

242.   But Kristi has refrained from publishing her website and advertising at bridal shows and magazines because she does not want to attract requests to provide wedding services for a same-sex wedding or for a ceremony where a

marrying individual identifies as a gender other than their biological sex that she would decline and increase her risk of being investigated, prosecuted, and thereby punished under the County's law even when doing so violates her beliefs and editorial judgment.

243. In these ways, the Accommodations Clause hinders Kristi's ability to offer and provide wedding services of her choosing, to promote her business and message, to expand her business, and to operate and tailor her business consistent with her beliefs and editorial judgment.

244. Likewise, the Accommodations Clause has caused Kristi to lose and continue to lose profits and business opportunities.

245. The law also conditions Kristi's ability to promote her desired religious beliefs about marriage, through her wedding services and on her social media accounts, on her willingness to express viewpoints that violate her religious beliefs.

246. Because Kristi cannot violate her religious beliefs, the Accommodations Clause pressures Kristi and those with her beliefs to leave the wedding industry altogether or risk severe penalties.

247. And because of overhead and opportunity costs, Kristi could not afford to officiate or write about as many weddings as she wants if she offered her services for free.

248. The Accommodations Clause also hinders Kristi's ability to make business planning decisions and operate her business as efficiently as possible.

249. For example, Kristi would like to respond to wedding-service requests by inquiring whether the prospective client seeks services celebrating a same-sex wedding ceremony or a ceremony where a marrying individual identifies as a

gender other than their biological sex, and to politely decline and refer these requests.

250.   But to avoid violating the County's law, Kristi does not ask any prospective client whether they seek services celebrating a same-sex wedding ceremony or a ceremony where a marrying individual identifies as a gender other than their biological sex.

251.   Instead, Kristi researches every wedding-services request that comes to her before responding to determine whether that request seeks services that violate her beliefs.

252.   Doing this research takes time and effort and reduces the amount of time and effort Kristi could spend on promoting and operating her business and hinders Kristi's ability to respond to wedding-service requests.

253.   Likewise, Kristi would like to provide couples with tools to pursue a long-lasting marriage that honors God as part of her officiating services, including a packet of devotional materials on marriage.

254.   But Kristi has refrained from creating and printing these packets because she cannot commit the necessary time and resources while knowing that she faces significant penalties under the law for operating her business consistent with her religious beliefs.

255.   Likewise, Kristi would like to sign up for HoneyBook, a subscription-based client management program that helps to manage business processes, so long as the subscription remains cost-effective for her business.

256.   But Kristi has refrained from doing so because HoneyBook prohibits its subscribers from operating their business in a manner that violates local laws.

257.    The Accommodations Clause also makes it illegal for Kristi to post a statement (attached to this complaint as Exhibit 1) on her social media sites and her business website (once launched) that explains what wedding services she provides.

258.    A true and correct copy of this statement is attached to this complaint as Exhibit 1.

259.    Kristi desires to post this statement because she is religiously motivated to be upfront and honest with clients, potential clients, and the public, *see supra* ¶¶ 199–201, and wants to avoid giving any false impression about the services Covenant Weddings will provide.

260.    And because Kristi is religiously motivated to promote marriage between one biological man and one biological woman, *see supra* ¶¶ 69–89, Kristi desires to explain on her business website and directly to prospective clients why her business promotes such marriages.

261.     The Accommodations Clause also makes it illegal for Kristi to make statements materially similar to Exhibit 1 on her website, her social media sites, or directly to potential clients.

262.    Because of the Accommodations Clause, Kristi has not and will not post her desired statement (Exhibit 1) or materially similar statements on her business' website or social media sites or make materially similar statements directly to prospective clients.

263.    If not for the County's law, Kristi would immediately begin to advertise her business more actively, to publish her business website, to begin inquiring whether requests seek wedding services that violate her beliefs, to print the devotional packet, and to subscribe to HoneyBook.

264.   If not for the County's law, Kristi would immediately post the statement in Exhibit 1 or materially similar statements on her website or social media sites and make materially similar statements directly to prospective clients.

265.   Kristi is refraining from the activities listed in paragraphs 237–63 because she faces a credible threat and substantial risk that she will be investigated or prosecuted under the County's law for offering wedding services only for opposite-sex weddings and for posting her desired statement and making materially similar statements on her business' website (when published) and social media sites or directly to prospective clients.

266.   Kristi's actions are reasonable because she faces ongoing, additional, and immediate burdens whenever she receives requests for wedding services.

267.   Kristi's actions are also reasonable because she faces a likelihood and substantial risk that she will receive additional requests for wedding services for same-sex wedding ceremonies or for wedding ceremonies where at least one marrying individual identifies and presents as a member of the opposite-sex.

268.   For instance, according to the most recent data from the United States Census Bureau, Ohio is the state with the 7th most same-sex couples in the country. https://www2.census.gov/programs-surveys/demo/tables/same-sex/time-series/ssc-house-characteristics/ssex-tables-2018.xlsx (table 3).

269.   According to the Williams Institute, Cuyahoga County has the second most same-sex couples of any county in Ohio. https://williamsinstitute.law.ucla.edu/visualization/lgbt-stats/?topic=SS&area=39035&compare=total#comparison.

<u>Cuyahoga County actively enforces its law.</u>

270.    The County's Law was passed by the Cuyahoga County Council on September 25, 2018 and signed by the County Executive on September 27, 2018.

271.    The Cuyahoga County Council created the Commission to enforce the County's law. Cuyahoga Cty. Code § 206.13(A), (H).

272.    The Commission consists of three members who must be attorneys. Cuyahoga Cty. Code § 206.13(B).

273.    The County Executive did not appoint Commissioners until February 2019.

274.    The Commission is responsible for administering and enforcing the County's law and has "all powers reasonable and necessary to fulfill the purpose of this Chapter and Title 15." Cuyahoga Cty. Code § 206.13(I)(10).

275.    The County's law also requires the County Executive to appoint an Executive Director over the Commission who oversees the Commission and executes the Commission's policies and actions. Cuyahoga Cty. Code § 206.13(K)(1).

276.    The County's law empowers any "person" to file complaints with the Commission alleging that a person "has engaged or is engaging in any unlawful discriminatory practice or act as defined" by Cuyahoga County's law—including complaints alleging violations of the Accommodations Clause. Cuyahoga Cty. Code § 1501.03(A)(1).

277.    The law defines "person" as "one (1) or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, and trustees in bankruptcy, receivers, and other organized groups of persons." Cuyahoga Cty. Code § 1501.01(V).

278.    As persons, any Cuyahoga County official may file complaints with the Commission alleging that public accommodations have or are committing unlawful practices as defined by Cuyahoga County's law.

279.    Any person may also file a complaint with the Commission alleging that a public accommodation has or is engaging in unlawful practices as defined by Cuyahoga County's law—whether those unlawful practices are committed against the Complainant or someone else. *See* Cuyahoga Cty. Code § 1501.04(D)(1) (Commission can determine if Respondent engaged or engages in unlawful practices "against the Complainant or others").

280.    Once a person files a complaint with the Commission, the Commission must serve the party alleged to have engaged in unlawful discrimination (the "Respondent") within 14 days. Cuyahoga Cty. Code § 1501.03(C)(1).

281.    The Respondent has 30 days from receiving the complaint to file a response with the Commission. Cuyahoga Cty. Code § 1501.03(C)(3).

282.    When a person files a complaint with the Commission, "the Commission or its authorized designee must determine … whether a Complaint of discrimination alleges a violation based on … sexual orientation or gender identity or expression" or some other protected characteristic. Cuyahoga Cty. Code § 1501.03(A)(1).

283.    Complaints of discrimination "based exclusively on sexual orientation and/or gender identity or expression shall be adjudicated by the Commission" in accordance with Cuyahoga County's law. Cuyahoga Cty. Code § 1501.03(A)(4).

284.    The Commission has the power to, at any time during an investigation, issue subpoenas to compel the attendance of witnesses and to require the production of any evidence about a matter under investigation by the Commission. Cuyahoga Cty. Code § 206.13(I)(2).

285.    The Commission also has the power to, at any time during an investigation, command the production of any names of persons necessary for the investigation of any person, institution, workplace, club, or other place or provider of public accommodation. Cuyahoga Cty. Code § 206.13(I)(3).

286.    The Commission also has the power to, at any time during an investigation, require someone to preserve records and to continue to make and keep records if kept in the ordinary course of business within the previous two years and if relevant to determine whether an unlawful discriminatory practice under the County's law has occurred. Cuyahoga Cty. Code § 206.13(I)(4).

287.    The investigatory process is significantly intrusive in that it forces the Respondent to divert resources from business operations by responding to the complaint, producing the requested records, appearing in person when requested, and preserving the requested records.

288.    Likewise, because the investigatory process occurs in the context of an adversarial proceeding, the investigation requires the Respondent to consider hiring an attorney and carries the threat of further punishment.

289.    The Executive Director has a duty to conciliate the dispute "to the extent feasible." Cuyahoga Cty. Code § 1501.03(D).

290.    If conciliation fails, the Commission must render a decision on the complaint within 90 days of its filing. Cuyahoga Cty. Code § 1501.03(D)(3).

291.    To render a decision on the merits, the Commission must schedule a hearing to be held within 90 days of receiving a complaint unless impracticable to do so. Cuyahoga Cty. Code § 1501.04(B).

292.    Before this hearing, the Commission has the authority to issue subpoenas to "compel the attendance of witnesses and require the production by them of books, papers, documents and other materials." Cuyahoga Cty. Code § 1501.04(C)(3).

293.    At this hearing, "the Commission may examine witnesses, administer oaths, take testimony of any person under oath, and receive evidence." Cuyahoga Cty. Code § 1501.04(C)(2).

294.    At this hearing, the Commission is not bound by the rules of evidence applicable in the courts of law, but must consider evidence from any source (including statistical data) that may tend to prove the existence of a predetermined pattern of discriminatory practice or act. Cuyahoga Cty. Code § 1501.04(C)(4).

295.    After the hearing, the Commission shall issue a final decision and order determining whether a respondent "has engaged in, or is engaging in, any unlawful discriminatory practice … against the Complainant or others." Cuyahoga Cty. Code § 1501.04(D)(1).

296.    Upon finding that a respondent has or is engaged in unlawful discriminatory practices against the Complainant or anyone else, the Commission may assess the following penalties:

- an order requiring the Respondent to cease and desist from such unlawful discriminatory practice or act, Cuyahoga Cty. Code § 1501.04(D)(1);

- an order requiring the Respondent to take such further affirmative or other action as will effectuate the purposes of the County's law, Cuyahoga Cty. Code § 1501.04(D)(1);

- fines from $1,000-$5,000 per violation, depending on their frequency, Cuyahoga Cty. Code § 1501.05(B)(1)–(3);

- attorney fees and costs to be paid by respondent to the complainant, Cuyahoga Cty. Code § 1501.05(C).

297. The Commission may enforce its orders in court. Cuyahoga Cty. Code § 1501.05(D).

298. Kristi's fear of being investigated and prosecuted by the Commission for allegedly violating the Accommodations Clause has caused her to refrain from advertising Covenant Weddings more, publishing the Covenant Weddings website, printing the devotional packet, subscribing to HoneyBook, operating and tailoring her business consistent with her beliefs, and expanding her business and ministry, which has caused her to lose business opportunities and not promote her desired message for fear of attracting requests and complaints filed with the Commission. *See supra* ¶¶ 242–44; 253–56.

299. Kristi's fear of being investigated and prosecuted by the Commission for allegedly violating the Accommodations Clause has also caused Kristi to refrain from posting her desired statement (Exhibit 1) or making materially similar statements on her website, social media sites, or directly to prospective clients. *See supra* ¶¶ 257–62

300. Kristi's fear of being investigated and prosecuted by the Commission for allegedly violating the Accommodations Clause has also caused Kristi to refrain from asking prospective clients seeking wedding services about whether the requested services celebrate a same-sex wedding ceremony or a ceremony where a marrying individual identifies as a gender other than their biological sex. *See supra* ¶¶ 249–50.

301. Kristi's fear of being investigated and prosecuted by the Commission for allegedly violating the Accommodations Clause has also caused Kristi to research

every request for wedding services she receives, causing her to lose time and reducing the amount of time and effort Kristi has to spend on promoting and operating her business. *See supra* ¶¶ 251–52.

<u>Cuyahoga County's law singles out wedding messages and ceremonies it disfavors</u>

302.   The Accommodations Clause prohibits Kristi from exclusively providing wedding services that promote opposite-sex weddings with couples who identify with their biological sex while allowing other public accommodations to provide wedding services that promote and celebrate same-sex marriage or marriage between those who identify contrary to their biological sex.

303.   This distinction turns entirely on the viewpoint that a business owner holds and the content that he or she chooses to express.

304.   Many wedding officiants are willing to perform both opposite-sex and same-sex wedding ceremonies and promote and offer these services in and near Cleveland and across Ohio.

305.   For example, Wedding Wire, an online service that allows individuals to search for wedding vendors (including wedding officiants), lists over 70 wedding officiants in and near the Cleveland area: https://www.weddingwire.com/c/oh-ohio/cleveland-erie/wedding-officiants/510-9-rca.html.

306.   Similarly, Wedding wire lists over 150 wedding officiants in Ohio: https://www.weddingwire.com/c/oh-ohio/wedding-officiants/9-sca.html.The Wedding Wire's Terms of Use prohibits its vendors—including wedding officiants—from "refusing to provide or accept service" based on sexual orientation. https://www.weddingwire.com/corp/legal/terms-of-use.

307.    Therefore, upon information and belief, there are at least more than 70 wedding officiants in and near Cleveland and at least more than 150 wedding officiants in Ohio who will officiate same-sex weddings.

308.    Many of the officiants and ministers listed in these directories are also willing to perform wedding ceremonies between individuals who identify contrary to and consistent with their biological sex.

309.    Many of the officiants and ministers listed in these directories and across the country also offer customized writing services.

310.    When it comes to officiating and composition services provided for weddings and for the wedding-officiating and services market, Kristi is in direct competition with the businesses identified above. *See supra* ¶¶ 304–09.

311.    But when the County passed its law, this law imposed increased regulatory burdens on Kristi that it did not impose on these other businesses in Cuyahoga County.

312.    For example, to avoid being harmed by the County's law, Kristi must refrain from publishing her desired statement, refrain from publishing her business website, refrain from advertising her business more, refrain from asking prospective clients certain questions, and refrain from tailoring her services and operating her business in certain ways (s*ee supra* ¶¶ 239–43, 248–62) while these other businesses in Cuyahoga County do not face these burdens because they willingly promote both opposite-sex and same-sex weddings and promote weddings where persons both identify contrary to and consistent with their biological sex.

313.    These differences make it harder for Kristi to compete and intensify the competition in the wedding services market, make it easier for her competition to compete against her, lower the costs and effort for other businesses to provide

officiating and composition services, illegally structure a competitive environment, make it harder for Kristi to promote her business in comparison to these other businesses, and impose a reputational harm on her business that these other businesses do not suffer.

314.    Upon information and belief, many other Cuyahoga County-based businesses promote their views in favor of same-sex marriage and of individuals identifying contrary to their biological sex through their business platforms, advertising, and willingness to create expression celebrating such unions.

315.    Kristi supports the right of these ministers to communicate their own beliefs and to determine for themselves the ceremonies they can officiate, including the right to decline to create expressive work and personally officiate some ceremonies.

316.    Kristi wants this same freedom. The County's law denies it to her.

## Legal Allegations

317.    Plaintiffs Kristi Stokes and Covenant Weddings are subject to and must comply with the County's Accommodations Clause.

318.    This clause violates Plaintiffs' rights under the United States and Ohio Constitutions and chills and deters Plaintiffs from exercising those rights.

319.    As a direct and proximate result of the Defendant's violation of the Plaintiffs' state and federal constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief as well as compensatory and nominal damages.

320.    Plaintiffs do not have an adequate monetary remedy or remedy at law for the loss of their constitutional rights.

321.   Unless the Defendant is enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

<u>First Cause of Action</u>
<u>First Amendment: Freedom of Speech, Association, and Press</u>

322.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1–321 of this complaint.

323.   The First Amendment's Free Speech Clause protects Plaintiffs' ability to speak freely, create speech, publish speech, sell speech, distribute speech, control their expressive process, associate with others for expressive purposes, and associate with expression of Plaintiffs' choosing.

324.   The First Amendment also protects Plaintiffs' ability to decline to speak, to exercise editorial control over their speech and expressive process, to decline to create speech, to decline to publish speech, to decline to sell speech, to decline to associate with others for expressive purposes, and to decline to associate with expression that Plaintiffs disagree with.

325.   The First Amendment also protects Plaintiffs' right to be free from content and viewpoint discrimination.

326.   Plaintiffs' wedding services and all activities associated with those services are forms of protected speech, publication, and expressive association.

327.   As applied to Plaintiffs, the Accommodations Clause compels speech Plaintiffs object to, interferes with their editorial judgment and expressive process, compels them to sell, publish, and disseminate speech they object to, compels them to engage in unwanted expressive association, compels them to associate with expression they disagree with, and regulates speech, association, editorial judgment, and publication based on content and viewpoint.

328.   As applied to Plaintiffs, the Accommodations Clause is a content-based and viewpoint-based regulation that bans, chills, and burdens Plaintiffs' desired speech, editorial judgment and expressive process, publication, and association by requiring Plaintiffs to engage in objectionable speech, associations, and publishing if they wish to engage in the speech, associations, and publication of speech they desire.

329.   As applied to Plaintiffs, the Accommodations Clause is a content-based and viewpoint-based regulation that bans, chills, and burdens Plaintiffs' desired speech and publication on Covenant Weddings' website, on Covenant Weddings' social media sites, and directly to prospective clients, and that inhibits Plaintiffs from forming expressive associations they desire to form and from avoiding expressive associations and expression that Plaintiffs disagree with.

330.   Plaintiffs have not engaged in, and will not engage in, certain protected speech, expression, and editorial decisions because of the Accommodations Clause.

331.   Defendant serves no valid, let along compelling, interest in infringing on Plaintiffs' free speech, free association, and free press rights.

332.   The Accommodations Clause is not a narrowly tailored way of achieving any valid state interest.

333.   Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections for free speech, free association, and free press.

Second Cause of Action<br>First Amendment: Free Exercise of Religion

334.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1–321 of this complaint.

335.   The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate and tailor their business, to create expression, to not create expression, to

participate in religious exercises, to not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

336.   The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being targeted for their religious beliefs, being subject to government hostility for their religious beliefs, being subject to individualized assessments, being subject to laws that lack neutrality and general application, and being punished for exercising their religious beliefs.

337.   Plaintiffs exercise their religion under the First Amendment when they operate and tailor their business, provide wedding services, honestly communicate with clients and prospective clients about what wedding services they can and cannot provide, communicate Plaintiffs' religious beliefs about marriage between one biological man and one biological woman, and decline to communicate messages about marriage or gender that violate, contradict, or are inconsistent with Plaintiffs' religious beliefs about marriage or sex, and participate in or decline to participate in wedding ceremonies.

338.   As applied to Plaintiffs, the Accommodations Clause substantially burdens Plaintiffs' sincerely held religious beliefs by requiring them to operate and tailor their business in ways that violate, contradict, or are inconsistent with their religious beliefs or to close their business in violation of their religious calling, by stopping them from being honest with prospective clients, by stopping them from asking prospective clients certain questions, by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech and association, by compelling speech and association

that they are religiously obligated to avoid, and by forcing them to participate in, officiate, promote, and celebrate religious ceremonies prohibited by their religious beliefs.

339.   The Accommodations Clause does not force nonreligious persons and businesses to choose between these same options when they are faced with requests to promote messages or to participate in religious ceremonies they disagree with or to explain what messages they will promote and ceremonies they will participate in.

340.   The Accommodations Clause impermissibly prefers some religious views over others by allowing those who own and operate public accommodations to express religious beliefs and participate in wedding ceremonies in favor of same-sex marriage and in favor of identifying contrary to one's biological sex but not allowing public accommodations to express religious beliefs or participate in wedding ceremonies exclusively in favor of opposite-sex marriage or identifying consistent with one's biological sex.

341.   The Accommodations Clause is not facially or operationally neutral or generally applicable, is hostile towards religion, targets and shows favoritism towards certain religious beliefs, allows individualized assessments, contains categorical exemptions, and imposes special disabilities on Plaintiffs due to their religious beliefs.

342.   The Accommodations Clause also violates Plaintiffs' free exercise rights under the hybrid-rights doctrine because it implicates free exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, and free press.

343.   The Accommodations Clause imposes severe coercive pressure on Plaintiffs to change or violate their religious beliefs and religiously motivated actions.

344. Defendant does not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' rights to freely exercise their religion.

345. Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections to freely exercise their religion.

Third Cause of Action<br>First Amendment: Establishment Clause

346. Plaintiffs repeat and reallege each allegation contained in paragraphs 1–321 of this complaint.

347. The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

348. The Accommodations Clause forces Plaintiffs to participate in, attend, and personally direct religious exercises contrary to their sincerely held religious beliefs.

349. The Accommodations Clause also grants denominational preferences by not requiring nonreligious persons and businesses, or religious persons and businesses whose religion supports same-sex marriage and identifying contrary to one's biological sex to make the same choices Plaintiffs must make when they are faced with a request to participate in wedding ceremonies or to promote messages they disagree with.

350. Defendant does not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in, attend, and personally direct religious exercises contrary to their sincerely held religious beliefs or by favoring certain religious beliefs over Plaintiffs' beliefs.

351.    Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections to be free from Defendant's Establishment of Religion.

Fourth Cause of Action
Ohio Constitution Art. I, § 7: Religious Freedom

352.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1–321 of this complaint.

353.    Article I, Section 7 protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

354.    Article I, Section 7 prohibits laws—including neutral and generally applicable laws—from directly or indirectly infringing on a person's sincerely held religious beliefs unless the law serves a compelling state interest and is the least restrictive means of furthering that interest.

355.    Kristi operates Covenant Weddings in accordance with her sincerely held religious beliefs.

356.    Plaintiffs act or refuse to act in a manner motivated by sincerely held religious beliefs when they operate their business, provide wedding services, honestly communicate with clients and prospective clients about what wedding services they can and cannot provide, communicate Plaintiffs' religious beliefs about marriages between one biological man and one biological woman, and decline to communicate messages about marriage or gender that violate, contradict, or are inconsistent with Plaintiffs' religious beliefs about marriage or sex, and participate in or decline to participate in wedding ceremonies.

49

357.   As applied to Plaintiffs, the Accommodations Clause substantially burdens Plaintiffs' sincerely held religious beliefs by requiring them to operate and tailor their business in ways that violate, contradict, or are inconsistent with their religious beliefs or to close their business in violation of their religious calling, by stopping them from being honest with prospective clients, by stopping them from asking prospective clients certain questions, by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech and association, by compelling speech and association that they are religiously obligated to avoid, and by forcing them to participate in, officiate, promote, and celebrate religious ceremonies prohibited by their religious beliefs.

358.   Defendant does not serve any compelling or even valid interest by infringing on and substantially burdening Plaintiffs' constitutional right to freely engage in their religious practices.

359.   Defendant does not use the least restrictive means to further any compelling or even valid interest by infringing on and substantially burdening Plaintiffs' constitutional right to freely engage in their religious practices.

360.   Accordingly, as applied to Plaintiffs, the Accommodations Clause violates Plaintiffs' religious freedom under Section 7, Article I of the Ohio Constitution.

## Prayer for Relief

Plaintiffs respectfully request that this Court enter judgment against Defendant and provide Plaintiffs with the following relief:

1.   A preliminary and permanent injunction to stop Defendant and any person acting in concert with them from enforcing the Accommodations Clause in the County's law as applied to Plaintiffs' constitutionally protected religious exercise,

right to be free from the establishment of religion, and constitutionally protected speech, association, and free press;

2.     A declaration that the Accommodations Clause violates the United States Constitution's First Amendment protections for free exercise of religion, against the establishment of religion, and for speech, association, and free press as applied to Plaintiffs' constitutionally protected activities;

3.     A declaration that the Accommodations Clause violates the Ohio Constitution's protections for free exercise of religion as applied to Plaintiffs' constitutionally protected activities;

4.     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.     That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.     That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorney fees, in accordance with 42 U.S.C. § 1988;

7.     That this Court award nominal and compensatory damages to Plaintiffs;

8.     That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs;

9.     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 22nd day of July, 2020.

Jonathan A. Scruggs
AZ Bar No. 030505*
Katherine L. Anderson
AZ Bar No. 033104*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFflegal.org
kanderson@ADFlegal.org

David A. Cortman
GA Bar No. 188810*
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
MN Bar No. 396303*
Alliance Defending Freedom
20116 Ashbrook Place, Suite 258
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

*s/ Matthew J. Burkhart*
Matthew J. Burkhart
OH Bar No. 0068299
Gallagher Kavinsky & Burkhart LPA
8740 Orion Place, Suite 200
Columbus, OH 43240-4063
(614) 885-9022
(614) 885-9024 (facsimile)
mjb@gkb-law.com

ATTORNEYS FOR PLAINTIFFS

*Motions for *Pro Hac Vice* Admission filed concurrently

**Declaration under penalty of perjury**

I, Kristi Stokes, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this <u>21st</u> day of <u>July</u>, 2020, at <u>Parma</u>, Ohio

_Kristi M. Stokes_
Kristi Stokes